IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

CHARLES JAMES GRAPSKI,

     Plaintiff,

v.                                                    CASE NO. 1:10-cv-00140-MP-GRJ

PATRICK BARCIA, JR, JEAN CALDERWOOD, CITY OF ALACHUA, FLORIDA, GIB
COERPER, ROBERT E JERNIGAN, CLOVIS WATSON, JR,

     Defendants.

_____/

# **O R D E R**

     This matter is before the Court on Doc. 30, Motion to Dismiss Amended Complaint by

defendants Patrick Barcia, Jr., Jean Calderwood, Gib Coerper, Robert E Jernigan, and Clovis

Watson, Jr. (collectively "Individual Defendants"), and on Doc. 31, Motion to Dismiss Amended

Complaint by defendant City of Alachua (hereinafter "City" or "Alachua").  In his Amended

Complaint at Doc. 24, plaintiff, Charles Grapski, claims several constitutional and statutory

violations perpetrated by the City and the Individual Defendants, including violations of

Grapski's right to (1) free speech, (2) petition the government, (3) equal protection, and (4)

security against unreasonable searches and seizures.  Grapski also makes several claims based on

Florida law, including (1) malicious prosecution, (2) negligent training and supervision, (3) false

arrest, and (4) battery.  He alleges these violations against various combinations of the City and

members of the Individual Defendants.  The defendants raise several grounds for dismissal of the

Amended Complaint, based on theories such as improper pleading, the statute of limitations,

estoppel, failure to state a claim upon which relief can be granted, and qualified immunity.  For

the following reasons, defendants' motions to dismiss are granted in part and denied in part.

Because this Order concerns a motion to dismiss, this Court "must 'view the allegations of the complaint in the light most favorable to the plaintiff[], consider the allegations of the complaint as true, and accept all reasonable inferences therefrom.'" *La Grasta v. First Union Sec., Inc.*, 358 F.3d 840, 845 (11th Cir. 2004) (quoting *Omar v. Lindsey*, 334 F.3d 1246, 1247 (11th Cir. 2003)).  Therefore, the Court will proceed as if the following allegations raised in the Amended Complaint are true.

At all times relevant to this action, Grapski, a resident of Alachua, was "a political and social activist."  Doc. 24 ¶ 20.  He has been "a vocal critic of the City administration and of certain City personnel," *Id.* ¶ 22, and has "led a campaign to foster strict compliance with the public records laws of the State of Florida."  *Id.* ¶ 21.  In this capacity, he has frequently spoken at public hearings, engaged in political protest, and brought litigation against the City, particularly with respect to the 2006 City election.  *Id.* ¶¶ 23, 24.

In response, the City and several of its employees and officers have allegedly retaliated against Grapski.  The first incident came "in late April and early May of 2006."  *Id.* ¶ 35.  At the time, Grapski was running for the Florida House of Representatives for his district.  *Id.* ¶ 36.  He joined a lawsuit against Alachua County to contest the 2006 election.  *Id.* ¶ 37.  To support his cause, Grapski requested from Alachua's City Hall the inspection and copy of several public records pertaining to the election; however, Alachua's officials denied Grapski's request.  *Id.* ¶¶ 38-39.  In an effort to obtain these documents, Grapski traveled to the office of Clovis Watson, Jr., the City Manager to Alachua, on April 28, 2006.  *Id.* ¶¶ 14, 39, 40.  While speaking with Watson, Grapski recorded their conversation.  *Id.* ¶ 40. Watson knew Grapski was recording their conversation and consented to the recording.  *Id.*  Pursuant to arrangements made with Watson during their conversation, Grapski "returned to Alachua's City Hall on . . . May 1, 2006,

for the purpose of inspecting the public records." *Id.* ¶ 42.  While inspecting the records, Chief

of Police Robert Jernigan arrested Grapski, under Watson's order, for illegally recording the

April 28 conversation. *Id.* ¶¶ 18, 43.  Grapski alleges that Watson made the decision to have

Grapski arrested under color of law based on his role as City Manager.  At the time of the arrest,

no facts existed to support a reasonable inference of probable cause.  *Id.* ¶ 46.  Nonetheless, the

City, Watson, and Jean Calderwood, a representative of the City, elected to press charges against

Grapski.  *Id.* ¶ 16, 48.  A judge ultimately dismissed these charges on pretrial motions in

Grapski's favor on November 16, 2006.  *Id.* ¶ 52.

The second incident centered around Grapski's exclusion from City Hall.  In an effort to

continue his quest to obtain public records, Grapski visited the offices of City Attorney Marian

B. Rush.  This occurred in December 2006.  *Id.* ¶¶ 53, 55.  As City Attorny, "Rush was the

custodian of the public records." *Id.* ¶ 55.  Rush denied Grapski's request.  *Id.* ¶ 56.  Then, on

February 12, 2007, Grapski visited "Alacua's temporary City Hall with citizens Tamara Robbins

and Michael Canney for the purpose of inspecting public records and discussing Alachua's

failure to comply with earlier public records requests." *Id.* ¶ 58.  After records custodian Alan

Henderson refused this request, Grapski "requested that Watson assist him in obtaining the

records." *Id.* ¶ 59.  Watson refused and "directed Grapski to leave the City Hall." *Id.* ¶ 60.

Although no legal basis existed for the ejection, Watson "instructed Chief Jernigan to require

Grapski to leave." *Id.* ¶¶ 61, 62.  Watson made this decision "while acting as Alachua's City

Manager." *Id.* ¶ 63.  Jernigan then instructed a police officer to issue Grapski a written trespass

warning.  *Id.* ¶ 64.  He then ejected Watson from the premises despite a lack of probable cause.

*Id.* ¶ 65-66.

The next incident occurred on the night of February 12, 2007, when Grapski attended

Alachua's City Commission meeting.  *Id.* ¶ 69.  These meetings apparently allocate time for citizens to raise comments.  *Id.* ¶ 73.  During this period, Grapski attempted to speak about the "ongoing refusal of Alachua's employees and officials to respond to his public records requests," among other things.  *Id.*  However, upon handing Calderwood, Watson, and the City Attorney Rush "a copy of a letter pertaining to the requests he had made," Calderwood, acting as Mayor, "admonished Grapski with what she referred to as a 'final warning' for being 'disruptive.'"  *Id.* ¶¶ 74-75.  Grapski then returned to his seat and remained there during the meeting.  *Id.* ¶ 76.

After hearing several comments made "to him and about him" from persons in the audience, Grapski began discussing his letter and his complaints with fellow audience members. *Id.* ¶¶ 77-82.  During the course of this interaction, Grapski talked in a soft voice while "other members of the audience" talked as well.  *Id.* ¶¶ 78, 82.  He never interfered with or disrupted any speaker and did not disturb the meeting in any way.  *Id.* ¶ 81.  However, without provocation, Calderwood accused Grapski of "disrupting the meeting."  *Id.* ¶ 83.  Calderwood, acting as Mayor, ordered Jernigan to eject Grapski from the meeting.  *Id.* ¶¶ 84, 89.  Grapski retained his seat and peacefully raised his hands together so as to indicate that he would not resist an arrest.  *Id.* ¶¶ 87, 90.  Jernigan, acting as Chief of Police, placed handcuffs on Grapski, ordered Alachua police officers to remove Grapski, and ultimately arrested and charged Grapski with "trespass after warning, disorderly conduct, resisting arrest without violence, and resisting arrest with violence."  *Id.* ¶¶ 91-94.  On these charges, the State Attorney declined to file an information, and so "the initiated prosecution against Grapski terminated in his favor."  *Id.* ¶ 102, Doc. 1, ¶ 159.

Grapski suffered a second ejection from a City Commission meeting on August 6, 2007. He attended in order to again discuss "his ongoing efforts to secure public records," but also "to

advocate in favor of the abolishment of the consent agenda as a routine device to enact legislation." *Id.* ¶ 103.  During the citizens' comments, a member of the audience, Robert Sharpe, accused Grapski of writing bad checks. *Id.* ¶ 104.  As the citizens' comments portion of the meeting neared closing, Grapski "rose to . . . reply to Sharpe's false allegations." *Id.* ¶ 106. Grapski displayed "appropriate decorum" and "did not act in a disruptive manner." *Id.* ¶ 107. However, Gib Coerper, "who was then serving as Mayor of Alachua, peremptorily directed Jernigan to remove Grapski from the meeting." *Id.* ¶ 108.  Grapski left the meeting to avoid arrest.

The final incident occurred when Chief Jernigan conducted an investigation into Grapski's alleged bad check. *Id.* ¶ 185.  Through this investigation, Jernigan discovered Grapski's bank information, which was subsequently leaked to Calderwood's husband. *Id.* ¶ 185(K).  The husband then posted the information over the internet. *Id.*  After learning about these events and Jernigan's investigation, Grapski went to the "Alachua police station to file an official complaint against the Alachua police department and Chief Jernigan" regarding the investigation and the leak. *Id.* ¶¶ 187-88.  Jernigan refused to speak with Grapski. *Id.* ¶ 190. Grapski then waited in the lobby for approximately twenty minutes to speak with the second in command. *Id.* ¶¶ 190-91.  He remained quiet and nondisruptive. *Id.* ¶ 192.  Jernigan then "appeared in the public lobby and asked Grapski to accompany him outside." *Id.* ¶ 194.

While outside, Jernigan refused to accept the complaints. *Id.* ¶ 196.  Grapski insisted and then, after consulting with Watson, Jernigan still refused to accept the complaints. *Id.* ¶¶ 197-98. Jernigan then reentered the lobby of the police station and physically locked Grapski outside. *Id.* ¶ 199.  This occurred "during normal business hours and the building was otherwise open to the public." *Id.* ¶ 200.  Grapski then knocked on the door and again asked permission to file a

complaint.  *Id.* ¶ 201.  Jernigan and Patrick Barcia, Jr., an Alachua police officer, then came

outside next to Grapski.  *Id.* ¶¶ 19, 202.  After again refusing Grapski's requests, Barcia asked,

"'Is he under arrest yet?'"  *Id.* ¶¶ 203-05.  Although Grapski made "no threatening or aggressive

act of any kind," Jernigan, Barcia, and another officer "arrested Grapski on charges of

trespassing."  *Id.* ¶¶ 207-08.  Both Jernigan and Barcia "intentionally seized, attacked and

battered Grapski without his consent and without probable cause."  *Id.* ¶ 208.  This attack left

Grapski "near death" and forced him to attend both a hospital emergency room and North

Florida Regional Hospital in Gainesville for treatment.  *Id.* ¶¶ 217, 219, 220.  Eventually, the

State Attorney filed an information in case number 01-2007-CF-003672A charging Grapski in

several counts.  First, he was charged with the crime that originally resulted in his arrest,

trespass on land after warning.  In Count II, he was charged with resisting an officer with

violence, In Count III, he was charged with battery upon an officer (referring to Jernigan).

Count IV charged Grapski with battery on officer Barcia, and Count V charged battery upon

another policeman, Officer Lattimer.  On November 13, 2009, a jury acquitted Grapski of the

charge that originally justified the arrest, that of trespass on land after warning.  The jury also

acquitted him of resisting an officer with violence, and acquitted him of battery upon Jernigan.

*Id.* ¶ 225.   However, the jury did convict him of the battery which ensued only as part of his

arrest, the counts of battery upon Officer Barcia and battery upon Officer Lattimer.

On July 20, 2010, Grapski filed the instant action against the City and the Individual

Defendants, alleging both constitutional violations pursuant to 42 U.S.C. § 1988, and Florida

state law violations.  He then filed his Amended Complaint, at Doc. 24.  This Court has subject

matter jurisdiction pursuant to 28 U.S.C. § 1331, as well as supplement jurisdiction over

Grapski's state law claims pursuant to 28 U.S.C. § 1367(a).  The City and the Individual

Defendants filed their Motions to Dismiss, Docs. 30, 31, arguing for dismissal based on theories such as improper pleading, the statute of limitations, estoppel, failure to state a claim upon which relief can be granted, and qualified immunity.  Grapski then filed his Responses to these motions, Docs. 39, 40.  The City then filed a Reply to Grapski's Response, Doc. 47, raising similar arguments as it did in its Motion to Dismiss.

In considering a motion to dismiss brought under Fed. R. Civ. P. 12(b)(6), the Court "must 'view the allegations of the complaint in the light most favorable to the plaintiff[], consider the allegations of the complaint as true, and accept all reasonable inferences therefrom.'" *La Grasta v. First Union Sec., Inc.*, 358 F.3d 840, 845 (11th Cir. 2004) (quoting *Omar v. Lindsey*, 334 F.3d 1246, 1247 (11th Cir. 2003)).  The complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  Although this rule "does not require 'detailed factual allegations,'" a complaint that offers mere "'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007)).  When faced with a motion to dismiss, the Court must consider whether the complaint "contain[s] sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570).

In the instant case, both the City and the Individual Defendants raise several arguments for the dismissal of Grapski's Amended Complaint.  First, both argue that the Amended Complaint violates Fed. R. Civ. P. 10(b) as it amounts to nothing more than a prohibited "shotgun style" pleading.  Second, they argue that the Court must dismiss any and all claims stemming from Grapski's May 1, 2006 arrest as such claims are barred by the statute of limitations.  Third, they argue that the Court must dismiss all claims stemming from the August

13, 2007 arrest since those claims would constitute a collateral attack on Grapski's criminal

convictions.  Such an attack violates the holding of *Heck v. Humphrey*, 512 U.S. 477 (1994).

Fourth, the City argues that all § 1983 claims against it must be dismissed since Grapski fails to

allege that an official city policy or custom caused harm to Grapski.  It also argues that,

specifically with regard to Grapski's Equal Protection claim, Grapski has failed to adequately

plead his "class of one" status.  Fifth, the City argues that the law does not recognize a claim for

negligent training and supervision.  In the alternative, it argues that Grapski has failed to

sufficiently state a claim for negligent training and supervision.  Sixth, the City argues that the

Court must dismiss all claims for declaratory relief in Count II and any claims which arise under

the Florida Constitution.  Finally, the Individual Defendants argue that, because of qualified

immunity, the Court must dismiss all claims brought against them.  After reviewing the

Amended Complaint in light of these arguments, the Court grants in part and denies in part

defendants' motions to dismiss.  The Court will discuss each issue, respectively.

**SHOTGUN PLEADING**

        Both the Individual Defendants and the City argue that Grapski's Amended Complaint,

Doc. 24, should be dismissed for violating Fed. R. Civ. P. 10(b).  Docs. 30, 31.  They claim that

the Amended Complaint uses the prohibited "shotgun" method of pleading by incorporating "by

reference preceding paragraphs and claims into succeeding prayers for relief."  Doc. 30.  The

City, for example, notes that, through his incorporation by reference, Grapski has incoherently

grouped within the same counts "claims for damages under the 1st, 4th, and 14th Amendments"

alongside claims for damages under state law.  Doc. 31.  According to the City, such a pleading

makes framing an Answer "impossible."  *Id.*  Likewise, the Individual Defendants claim that

Grapski has grouped the defendants in an "unnecessarily confusing" manner that "does not allow

the Defendants an opportunity to frame their responsive pleadings." *Id.*  To support this claim,

they point to Grapski's treatment of defendant Coerper in Count I of the Amended Complaint.

*Id.*  There, Grapski "requests damages as the result of three different arrests, a trespass warning

and the prosecution of Plaintiff." *Id.*  While Grapski does not allege Coerper "to have taken part

in any of these events," he nonetheless "seeks money and punitive damages against him." *Id.*

According to defendants, such pleading is incoherent.

 Grapski presents a very different view of his Amended Complaint.  He argues that the

Amended Complaint "is the very antithesis of a shotgun pleading" and that both the Individual

Defendants and the City "essentially complain that the Amended Complaint is very long and

takes a modicum of effort to read."  Docs. 39, 40.  He claims that his only obligation as

complainant is "to give reasonable notice to defendants of the claims asserted."  Docs. 39, 40.

By balancing the "need for specificity" alongside the need for "concise pleading," Grapski

claims he "has done a yeoman's job of relating [this] complex story in a sensible and orderly

manner."  Docs. 39, 40.  He also argues that "there is nothing wrong with asserting that a

particular action was both a state law tort and a Federal constitutional violation."  Doc. 39 n.3;

Doc. 40 n.3.  Finally, with regards to the Individual Defendants' concern over the treatment of

defendant Coerper in Count I, Grapski claims that including Coerper within that Count was

"entirely logical" since "Coerper's actions were part of a larger conspiracy to violate Plaintiffs'

rights."  Doc. 40.  To not include Coerper in that Count would "cripple Plaintiff's ability to show

an established City policy to violate his rights." *Id.*  Moreover, according to Grapski, the only

alternative "would be a complaint of more than one hundred counts and several hundred pages."

*Id.*

 The Eleventh Circuit prohibits the use of "shotgun" style pleadings in establishing a

claim for relief.  *Strategic Income Fund v. Spear, Leeds & Kellogg*, 305 F.3d 1293 (11th Cir. 2002).  A "shotgun" style pleading is, by definition, a pleading that "contains several counts, each one incorporating by reference the allegations of its predecessors, leading to a situation where most of the counts (*i.e.*, all but the first) contain irrelevant factual allegations and legal conclusions."  *Id.* at 1295 n.9.  Such pleadings violate the mandates of Rule 10(b) of the Federal Rules of Civil Procedure, which requires that, "[i]f doing so would promote clarity, each claim founded on a separate transaction or occurrence . . . must be stated in a separate count."  Fed. R. Civ. P. 10(b).  As a result of a "shotgun" pleading, the complainant creates the difficult task of discerning "which allegations of fact correspond to which defendant or claim for relief." *Figueroa v. JP Morgan Chase Bank, N.A.*, No. 1:09-CV-1874-RWS, 2010 WL 411 7032, at *2 (N.D. Ga. Oct. 7, 2010) (citing *Anderson v. Dist. Bd. Of Trs. Of Cent. Fla. Cmt. Coll.*, 77 F.3d 364, 366 (11th Cir. 1996)).  Each count within such a pleading becomes "replete with factual allegations that could not possibly be material to that specific count, and . . . any allegations that are material are buried beneath . . . pages of rambling irrelevancies."  *Magluta v. Samples*, 256 F.3d 1282, 1284 (11th Cir. 2001).

Using the Eleventh Circuit's definition, Grapski's Amended Complaint is not a "shotgun" style pleading.  While each of the fifteen counts in the sixty-one page document incorporates by reference allegations raised previously in the complaint, they do not sequentially incorporate all allegations of each preceding count, as the definition requires.  *See Strategic*, 305 F.3d at 1295 n.9.  To be a "shotgun" pleading, Count XV would need to reallege all allegations raised in the preceding counts, amounting to the incorporation of paragraphs 1 through 351. However, Count XV of the Amended Complaint realleges only "the allegations set forth in paragraphs 2, 6 through 34, 114 through 127, and 185 through 230."  Doc. 24.  The Federal

Rules of Civil Procedure recognize the validity of this targeted approach to the incorporation of previous allegations.  *See* Fed. R. Civ. P. 10(b) ("A later pleading may refer by number to a paragraph in an earlier pleading.").  Rather than amounting to an invalid "shotgun" pleading, Grapski's Amended Complaint seems to target the relevant "inter-related events and multiple individuals" that compose each count.  Doc. 40.

However, while the complexities of Grapski's Amended Complaint may not rise to the level of "shotgun" pleading, they do approach the line separating clarity from obscurity in a fashion similar to that of "shotgun" pleadings.  The danger of "shotgun" pleadings lies in its tendency to undermine the pleading process by commingling within one claim various sets of allegations which have absolutely no relevance to that particular claim.  *See Anderson*, 77 F.3d at 366 (describing a complaint as a "perfect example of 'shotgun' pleading" where, after plaintiff failed to segregate his allegations with their respective claims, it became "virtually impossible to know which allegations of fact" corresponded with which claim for relief).  Graspki's Amended Complaint has committed this error on several occasions.

Turning first to the City's examples, each of Grapski's state law claims (Counts VI through XV) reallege paragraphs 114 through 127.  Many of these paragraphs have absolutely no relevance to the claims asserted in those counts.  For example, Count X of the Amended Complaint, which realleges those paragraphs, seeks damages based on the "State Law Tort Claim - Battery," referencing specifically the incident that occurred February 12, 2007.  Doc. 24.  However, the allegation that Grapski's "several arrests . . . and . . . repeated removals from public meetings . . . are not isolated events but are part of an intentional and calculated campaign to deprive Plaintiff of his constitutional rights" speaks nothing to the tort of battery, under Florida law.  *Id.* ¶ 114. Nor does the allegation that Grapski "has been deprived of his First

Amendment right to engage in free expression" bear any relevance to this tort claim. *Id.* ¶ 123. In short, Grapski has reincorporated a series of allegations into his state law claims which bear no relevance to those claims, similar to the function of a "shotgun" pleading.

What is perhaps more problematic is Grapski's treatment of the Individual Defendants in his federal claims. Turning to the Individual Defendants' example, at Doc. 30, Grapski claims damages in Count I against defendant Coerper for "[his] repeated arrests of the Plaintiff and other efforts to thwart his political activities in violation of Plaintiff's right of free speech." Doc. 24. This count reincorporates all allegations made in paragraphs 1 through 128, which include several arrests, ejections from town meetings, battery, and allegations of malicious prosecution. *Id.* Grapski seems to base his free speech claim(s) on these incidents. However, Coerper is only alleged to have participated in one incident, specifically a City Commission meeting in which Coerper, then Mayor of Alachua, directed defendant Jernigan, the Chief of Police, to "remove Grapski from the meeting." *Id.* ¶ 108. Grapski does not allege Coerper's involvement in any other incident. He does, however, claim that Coerper's act was "part of a larger campaign by which Alachua . . . harassed, intimidated, and physically battered Plaintiff, all in an effort to disrupt his speech and political activities." *Id.* ¶ 137.

The manner in which Grapski organizes Count I leaves open several possible interpretations as to the basis for Grapski's relief from Coerper. For example, Grapski may be demanding relief based solely on Coerper's actions described at paragraph 108. On the other hand, Grapski may be referencing that incident simply to implicate Coerper in some scheme by which all Individual Defendants seek to deprive Grapski of his free speech rights. He may be asserting both of these claims. Similar possibilities arise for Grapski's claims against each other Individual Defendant. In short, each of the Individual Defendants, the City, and this Court are

left to guess at what exactly constitutes the basis for Grapski's free speech claims.  Like "shotgun" pleadings, the Amended Complaint lacks the clarity necessary to satisfy Rule 10(b) of the Federal Rules of Civil Procedure.  Without clarification, Coerper is left to wonder whether he needs to defend against the isolated incident described at paragraph 108, his alleged participation in a conspiracy to deprive Grapski of his free speech rights, or both.

Given the Amended Complaint's obscurity, the defendants should not be required to give a responsive pleading at this time.  However, contrary to the defendants' demands, dismissal is not the proper remedy.  The Amended Complaint does not rise to the same level of obscurity as "shotgun" pleadings.  Even if it did, "dismissal of the complaint with prejudice is a drastic sanction and requires a showing that the plaintiff acted willfully or in bad faith, or that lesser sanctions will not suffice."  *Figueroa*, WL 4117032 2010, at *2.  As an alternative to dismissal, "[t]he court should freely give leave [to amend] when justice so requires."  Fed. R. Civ. P. 15(a)(2).  Since there is no evidence that bad faith gave rise to the problems with the Amended Complaint, this Court finds that Grapski must file a second amended complaint.  In doing so, he must specify the claims he brings against each defendant, dividing into separate counts "each claim founded on a separate transaction or occurrence."  Fed. R. Civ. Pro. 10(b).  Failure to conform to these requirements may result in dismissal.

**STATUTE OF LIMITATIONS**

Next, all defendants seek to dismiss Grapski's constitutional claims which arise from his alleged false arrest on May 1, 2006, specifically those in Counts I through III.  Docs. 30, 31.  They argue that such claims violate Florida's four year statute of limitations for personal injury actions.  Fla. Stat. § 768.28(14).  Grapski, in turn, concedes this point, acknowledging that defendants' "discussion of that statute is accurate."  Doc. 40.  However, he then argues that none

of his federal claims are based on that false arrest.  Instead, they "are based on the First

Amendment . . . and the state law tort of malicious prosecution."  *Id.*  Since the prosecution of

Grapski's May 1, 2006 charges "terminated in his favor" on November 16, 2006, the filing of

Grapski's Original Complaint, Doc. 1, on July 20, 2010 was not time barred.  That filing fell

within the four year limit.

Defendants do accurately describe the applicable statute of limitations for any

constitutional claim under 42 U.S.C. § 1983.  In any § 1983 action, the court must apply "the

forum state's general personal injury statute of limitations."  *Reynolds v. Murray*, 170 F. App'x

49, 50-51 (11th Cir. 2006) (citing *Owens v. Okure*, 488 U.S. 235, 236 (1989)).  However,

"'[f]ederal law determines when the statute of limitations begins to run.'" *Id.* (quoting *Lovett v.

Ray*, 327 F.3d 1181, 1182 (11th Cir. 2003)).  Under Florida law, the general personal injury

statute of limitations is four years.  Fla. Stat. § 768.28(14).  Under federal law, "the statute of

limitations begins to run from the date 'the facts which would support a cause of action are

apparent or should be apparent to a person with a reasonably prudent regard for his rights.'"

*Brown v. Ga. Bd. Of Pardons & Paroles*, 335 F.3d 1259, 1261 (11th Cir. 2003) (quoting *Rozar v.

Mullis*, 85 F.3d 556, 561-62 (11th Cir. 1996)).  Applying these standards to Grapski's May 1,

2006 arrest, any constitutional claims that at least should have been apparent to Grapski at the

time of the arrest must be brought within four years of the arrest.  His ability to bring such a

claim would cease May 1, 2010, two months prior to the filing of Grapski's Original Complaint,

Doc. 1.

However, Grapski concedes this argument and states simply that he does not base his

constitutional claims on the arrest itself.  Rather, any claims remotely related to that incident

stem from the alleged malicious prosecution of those charges which only terminated in his favor

on November 16, 2006. Doc. 40. Thus, if the complaint should be construed to allege malicious

prosecution only, it falls within the statute of limitations.

This confusion over the basis for Grapski's constitutional claims stems from the same

problems of ambiguity noted above in this Court's discussion of "shotgun" pleadings. In each of

his first three Counts, Grapski reincorporates paragraphs 1 through 128 of his Amended

Complaint. In doing so, he realleges a hodgepodge of incidents, each of which he claims

somehow highlights infringements of his constitutional rights. This cluster of events includes

the May 1, 2006 arrest. *Id.* ¶¶ 42-46. However, Grapski makes no distinction between the

incidents described in paragraphs 1 through 128 that do and do not serve as the basis for his

claims. The explanations he does provide create an ambiguity as to which of those incidents are

actually relevant.

For example, Count I of the Amended Complaint, Doc. 24, which alleges the

infringement of Grapski's free speech rights, could conceivably be read to include a claim based

on the alleged malicious prosecution on November 16, 2006. At paragraph 137, he

acknowledges that "[t]he several . . . prosecutions" against him contribute to his claim for relief.

Doc. 24. On the other hand, a reader could interpret that same Count as including a free speech

claim based on the May 1, 2006 arrest. For example, the Count demands "damages against

Defendants . . . arising from their repeated arrests of the Plaintiff." *Id.* ¶ 130. It also states that

"Plaintiff has been repeatedly arrested by the Defendants when attempting to review public

records." *Id.* ¶ 134. Given the fact that the May 6 arrest occurred "[w]hile GRAPSKI was

inspecting . . . election records," *Id.* ¶ 43, the allegation at paragraph 134 seems to reference this

arrest. Similar allegations appear throughout the remainder of Count I as well as in Counts II

and III. *Id.* ¶¶ 135, 137, 141, 145, 146, 148, 156, 165. These several allegations, along with the

incorporation of paragraphs 42 through 46, suggest that Grapski does raise claims based on his alleged false arrest on May 1, 2006.

This inherent ambiguity highlights the need for amendment to this already once Amended Complaint.  The parties are clearly unable to agree on how to properly interpret the claims raised in this cause of action.  If Grapski does raise claims based on the May 1, 2006 arrest, those claims are barred by the four year statute of limitations.  If Grapski is instead basing his constitutional claims on the alleged malicious prosecution on November 16, 2006, he must clarify this in his pleading.  Once again, Grapski must specify the claims he brings against each defendant, dividing into separate counts "each claim founded on a separate transaction or occurrence."  Fed. R. Civ. Pro. 10(b).  Failure to abide by this demand for clarity may result in dismissal of the action.

### HECK v. HUMPHREY

Next, defendants challenge all claims related to Grapski's August 13, 2007 arrest.  Based on this arrest, Grapski raises Fourth Amendment constitutional claims against the City of Alachua, officer Jernigan, and officer Barcia (Count V).  Doc. 24.  He also brings state law claims against these defendants for false arrest, at Count XII, negligent training and supervision, at Count XIII, battery, at Count XIV, and malicious prosecution, at Count XV.  *Id.*  Defendants argue that these claims are barred by the doctrine of *Heck v. Humphrey*, 512 U.S. 477 (1994), which holds that any claim for recovery that would constitute a collateral attack on the complainant's criminal conviction is not cognizable.  *Heck*, 512 U.S. at 486-87.  They claim that since Grapski was arrested and convicted for the battery of officers Barcia and Lattimer, any tort claims concerning his arrest would constitute a collateral attack on those convictions, violating the mandates of *Heck*.

Grapski argues that *Heck* should not apply since he is "not pursuing any claims with respect to the charges on which he was convicted." Doc. 39.  He claims his convictions were based "on charges of battering a police officer as a result of an incident that occurred **after** his false arrest and in a different location." *Id.* n.9 (emphasis added).  In short, since "[t]here is no . . . relationship between the invalid arrest and the claim of battery on a law enforcement officer that came well afterwards," *Heck* does not apply.  Doc. 39.

The Court in *Heck* states that, "in order to recover damages for . . . harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus." *Heck*, 512 U.S. at 486-87.  If such a relationship exists between a civil action and "a conviction . . . that has *not* been invalidated," the civil action is "not cognizable under § 1983." *Id.*  The district court must consider "whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence." *Id.*

In the instant case, judgment in favor of Grapski on any claims arising from his August 13, 2007 arrest would not "imply the invalidity of his" convictions for battery on officers Barcia and Lattimer. *Id.*  Looking at the Amended Complaint in a light most favorable to Grapski, the initial arrest was not based on any battery upon either Barcia or Lattimer.  Rather, officers Jernigan and Barcia initiated the arrest solely in response to Grapski's request to enter the police department building and file complaints against both the Alachua police station and officer Jernigan.  Doc. 24, ¶¶ 188-208.  He claims that his battery upon officers Barcia and Lattimer came after the initial arrest and battery by officers Jernigan and Barcia. *Id.* ¶¶ 207-211.  During

the arrest, Grapski claims to have "made no threatening or aggressive act of any kind." *Id.* ¶ 207. Based on these allegations, Grapski's conviction was based not on the validity of his initial arrest on August 13, 2007, but rather on his battery of two officers which occurred subsequent to his initial arrest.

Under *Heck*, as long as a tort claim bears no relation to the validity of a complainant's criminal conviction or sentence, the claim may be brought. Moreover, "'[b]ecause an illegal search or arrest may be followed by a valid conviction, a successful § 1983 action for alleged Fourth Amendment violations does not necessarily imply the invalidity of a conviction.'" *Cedeno v. Gee*, No. 8:10-CV-484-T-30AEP, 2010 WL 1417273, at *4 (M.D. Fla. Apr. 7, 2010) (quoting *Hughes v. Lott*, 350 F.3d 1157, 1160 (11th Cir. 2003)). Based on his allegations, Grapski's claims stemming from his August 13 arrest do not imply the invalidity of his battery convictions. The *Heck* doctrine, thus, does not bar those claims.

## § 1983 CLAIMS AGAINST CITY OF ALACHUA

### A. *Custom/Policy*

Next, defendant City of Alachua argues that Grapski has not adequately plead a § 1983 claim against the City. It contends that in order to show the City caused a § 1983 constitutional violation, Grapski may not rely on theories of *respondeat superior* or vicarious liability. Instead, he must show that his "injury resulted from an 'official policy or custom' of the municipality." Doc. 31 (citing *City of Oklahoma v. Tuttle*, 471 U.S. 808 (1985)). By making "only vague and conclusory allegations that the City has an 'unwritten policy' to deprive Grapski of his constitutional rights," Grapski has failed to sufficiently allege the requisite policy or custom. *Id.* (quoting Doc. 24). Moreover, in order to sufficiently allege municipal liability under § 1983, Grapski must base his claims on the actions of those officials who have final policymaking

authority.  Doc. 31.  The City argues that Grapski has also failed to satisfy this requirement.

Grapski agrees that in order to show the City's liability for a § 1983 violation, he may not base his claim on indirect theories such as *respondeat superior* or vicarious liability, but must allege that some policy or custom caused his constitutional deprivations.  Doc. 39.  However, he argues that liability may be based on the showing of "an unofficial custom which is sufficiently widespread so that it can be considered to have assumed the force of law."  *Id.*  Moreover, liability may attach to a municipality where it fails to correct a history of constitutional violations.  *Id.*

To an extent, both the City and Grapski are correct.  Under the Supreme Court's ruling in *Monell*, "a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978).  Instead, liability attaches only where the "execution of a government's policy or custom . . . inflicts the injury." *Id.* at 694.  However, this custom need not be officially sanctioned by the municipality.  To prove a § 1983 custom, a plaintiff need only "establish a widespread practice that, 'although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law."  *Brown v. City of Fort Lauderdale*, 923 F.2d 1474, 1481 (11th Cir. 1991) (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988)). Moreover, "a municipality's failure to correct the constitutionally offensive actions of its employees can rise to the level of a custom or policy 'if the municipality tacitly authorizes these actions or displays deliberate indifference' towards the misconduct."  *Griffin v. City of Opa-Locka*, 261 F.3d 1295, 1308 (11th Cir. 2001) (quoting *Brooks v. Scheib*, 813 F.2d 1191, 1193 (11th Cir. 1987)). Therefore, in order to adequately plead municipal liability for a § 1983 violation, a plaintiff must at least allege the failure of a municipality to correct a history or

pattern of constitutionally offensive actions.

Grapski does adequately allege the existence of a custom so as to show § 1983 liability on the part of the City of Alachua.  He states this explicitly with the claim that his constitutional deprivations were the "result of an *actual policy of the City*."  Doc. 24, ¶ 31 (emphasis added). Moreover, he acknowledges that while this policy has not been "reduced to writing, [it] has been established by a long course of conduct and harassment directed to Plaintiff."  *Id.* ¶ 32.  He supports these allegations by pointing to a series of incidents in which his constitutional rights were deprived.  This series includes (1) refusals by City officials to allow Grapski to view public records, *Id.* ¶¶ 35-43, 55-65, (2) an unwarranted trespass warning, ¶¶ 64-65, (3) unwarranted ejections from City Commission meetings, ¶¶ 69-94, 103-11, (4) malicious prosecutions, ¶¶ 49-52, 99-102, and (5) a false arrest, ¶¶ 94-97, 205-17.  By establishing the existence of a series of alleged constitutionally offensive actions, Grapski has demonstrated what could reasonably amount to the City's deliberate indifference for the preservation of Grapski's constitutional rights.  In other words, viewing these allegations in the light most favorable to Grapski, a reasonable jury could infer the existence of a custom based on the City's repeated "failure to correct the constitutionally offensive actions of its employees."  *Griffin*, 261 F.3d at 1308.

As to the City's argument concerning the actions of "those officials who have final policymaking authority," Doc. 31, the Supreme Court has stated that "[m]unicipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered."  *Pembaur v. Cincinnati*, 475 U.S. 469, 481 (1986).  Standing alone, an official's exercise of discretion will not warrant municipal liability.   However, these points speak only to the liability which derives from the enactment or execution of some unlawful municipal policy by a final decisionmaker.  They do not concern the liability which

flows from a municipality's failure to correct a series of unconstitutional actions.

In his Amended Complaint, Grapski makes several references to the authorities held by certain individuals.  For example, he alleges that defendant Watson had the final decision-making authority to arrest Grapski on May 1, 2006, and to eject Grapski from City Hall on February 12, 2007.  Doc. 24, ¶¶ 42, 45, 64.  Likewise, Mayors Calderwood and Coerper each had the authority to eject Grapski from City Commission meetings.  *Id.* ¶¶ 88-89, 108-09.  Finally, defendant Jernigan, acting as Chief of Police, had the authority to arrest Grapski on August 13, 2007.  *Id.* ¶¶ 208 ,213.  In the context of a municipality's disregard for unconstitutional actions, by simply establishing the relevant authorities in power and the existence of specific allegedly unconstitutional acts, Grapski has adequately pleaded a municipal custom.

### B. Class of One Equal Protection Claims

Even if Grapski has sufficiently alleged the existence of a City custom of depriving Grapski of his constitutional rights, the City argues that he has failed to properly state a cause of action for an Equal Protection claim.  Grapski contends that he is a member of a "class of one" that, as a direct result of the City's policies, has been treated differently from other citizens of the City.   Doc. 24.  The City, on the other hand, contends that a "class of one" theory runs afoul of *Monell* and should not be legally recognized.  It also argues that, even if the "class of one" theory is recognized, Grapski has failed to properly plead that he was "treated differently from similarly situated persons."  *GJR Investments, Inc. v. Cnty. of Escambia*, 132 F.3d 1359, 1367-68 (11th Cir. 1998).  As an alternative, the City also claims that "in the non-regulatory context, there can be no 'class of one' claim to challenge purely discretionary actions."  Doc. 31.  For the reasons stated below, the Court finds that "class of one" theories should be recognized and that

Grapski has sufficiently pleaded his Equal Protection claim against the City.

Turning to the City's first argument, "class of one" pleadings are legally recognized. Use of the "class of one" theory derives from the well settled principle "that the Equal Protection Clause 'protect[s] persons, not groups.'"  *Engquist v. Or. Dept. Of Agr.*, 553 U.S. 591, 597 (2008) (quoting *Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 227 (1995) (emphasis omitted)).  The Supreme Court has acknowledged the legitimacy of the theory in several cases. *See, e.g.*, *Vill. of Willowbrook v. Olech*, 528 U.S. 562 (2000); *Allegheny Pittsburgh Coal Co. v. Comm'n of Webster Cnty.*, 488 U.S. 336 (1989); *Sioux City Bridge Co. v. Dakota Cnty.*, 260 U.S. 441 (1923).  Although the City would have this Court believe that *Monell* stands for the proposition that liability attaches to a municipality only where "a widespread custom or practice . . . affect[s] a group of people," Doc. 31, a careful reading of *Monell* shows that the Supreme Court never intended to tie municipal liability under § 1983 solely to the constitutional infringements of the rights of groups of persons.  *Monell*, 436 U.S. at 690-95 (1978).  Thus, "class of one" pleadings are legally sufficient.

In order to successfully allege a "class of one" in an Equal Protection context, the plaintiff must plead specifically how he was treated differently than similarly situated persons. With any Equal Protection claim, a plaintiff must sufficiently allege "(1) that [he was] treated differently from other similarly situated individuals, and (2) that Defendant unequally applied [the government's laws] for the purpose of discriminating against [the plaintiff]" *Campbell v. Rainbow City*, 434 F.3d 1306, 1314 (11th Cir. 2006).  To satisfy the first requirement, the plaintiff must at least "present a single instance in which a similarly situated" person was treated differently by the government.  *GJR Invs., Inc. v. Cnty. of Escambia*, 132 F.3d 1359, 1367 (11th Cir. 1998).  This instance must be specific.  If the plaintiff "merely alleges that nameless,

faceless 'other' [persons] were given better treatment," the Court must dismiss the claim.  *Id.*
Essential to any proper Equal Protection claim is the allegation that "these 'other' [persons] were
situated similarly to the plaintiff."  *Id.* at 1368.

The Court first notes that Grapski's Equal Protection claims in Count III of his Amended
Complaint cannot be based on the City's alleged custom of depriving him of his constitutional
rights.  Equal Protection claims stem from the notion that similarly situated individuals are
treated differently through the government's application of the same laws.  *Campbell*, 434 F.3d
at 1314.  The alleged City custom in this case is the perpetual deprivation of Grapski's
constitutional rights.  Such a custom, by its very nature, cannot be applied in an unequal fashion.
The only party to whom this custom could be applied is Grapski.  Thus, with regard to this
custom, there exists no similarly situated person with whom Grapski may use to support his
Equal Protection claims.

However, with regards to some of the City's other policies, Grapski does successfully
allege the existence of several similarly situated persons who were treated differently than
Grapski.  For example, he claims that the City allowed Robert Sharpe to speak at a City
Commission meeting on August 6, 2007, while it denied Grapski the same opportunity. Doc. 24
¶¶ 103-08.  He claims that he was not disruptive and that he, like Sharpe, attempted to speak
during the portion of the meeting reserved for citizens' comments.  *Id.* ¶¶ 104-07.  This
constitutes a specific allegation of the City's unequal application of its policies concerning a
citizen's entitlement to speak at City Commission meetings.  As to this allegation, Grapski has
satisfied the Equal Protection pleading requirements.  Likewise, Grapski alleges that on February
12, 2007, the City issued Grapski a trespass notice barring him from Alachua's City Hall.  Doc.
24 ¶¶ 159-60.  Grapski sought to inspect public records.  *Id.* ¶ 58.  Tamara Robbins and Michael

Canney accompanied Grapski on this trip.  *Id.*  Their "demands and behavior were indistinguishable from those of [Grapski]."  *Id.* ¶ 160.  However, the City issued neither of them a trespass notice.  The City applied its policies concerning the issuance of trespass notices in an unequal manner to similarly situated individuals.  Such allegations constitute an Equal Protection claim.

In short, as to the August 6, 2007 City Commission meeting and the February 12, 2007 City Hall incident, Grapski alleges two well pleaded Equal Protection claims.  As noted above, given the ambiguous and obscure nature of the Amended Complaint, the Court is unclear as to whether any other bases for relief are alleged in Count III.  If such claims do exist, they do not seem to satisfy the requirement that the plaintiff specifically allege the existence of similarly situated individuals.

Finally, the City argues that even if on occasion it treated Grapski differently than it did similarly situated individuals, those incidents amount to nothing more than "purely discretionary actions," which, according to the City, are protected actions.  Doc. 31.  For support, the City relies on the Supreme Court's decision in *Engquist v. Or. Dept. Of Agr.*, 553 U.S. 591 (2008), in which the Court discussed "class of one" Equal Protection claims in the context of the government actor who exercises discretionary authority.  The Court noted that "[t]here are some forms of state action . . . which by their nature involve discretionary decisionmaking based on a vast array of subjective, individualized assessments."  *Id.* at 603.  In such cases, the Equal Protection clause is not violated where the state treats similarly situated individuals differently "because treating like individuals differently is an accepted consequence of the discretion granted. . . . [A]llowing a challenge based on the arbitrary singling out of a particular person would undermine the very discretion that such state officials are entrusted to exercise."  *Id.*  The

Court likened its explanation to the legitimacy of the discretion exercised by a traffic officer who decides to stop and ticket one particular speeding car as opposed to any of the other speeding cars nearby.  *Id.* at 603-04.  To allow a "class of one" Equal Protection claim on those facts "would be incompatible with the discretion inherent in the challenged action."  *Id.* at 604.

In each of Grapski's alleged Equal Protection violations, the City arguably employed its own discretion.  With the February 12, 2007 trespass notice, the officer who issued the notice presumably used his subjective judgment concerning what he felt was the best course of action to take in that particular situation.  Likewise, when Coerper, Mayor of Alachua, directed officer Jernigan to remove Grapski from the City Commission meeting on August 6, 2007, he was arguably exercising his discretion as to whether Grapski's actions up to that point had caused a disruption sufficient to warrant ejection.  According to *Engquist*, Grapski may not challenge the City's decisions individually.  To do so would be to undermine the discretion inherent in the challenged action.

However, the guidance in *Engquist* stands only for the proposition that the "class of one" Equal Protection argument may not be used to challenge any *single* instance of the exercise of state discretion.  It does not speak to whether a *pattern* of "singling out" one individual over similarly situated individuals under the guise of inherent discretion is protected.  This Court holds that such repeat "singling out" is not protected under the *Engquist* guidance.  While a traffic officer may be protected in exercising his discretion by stopping one speeding car out of a group of several, he must not be protected where he repeatedly stops that same car to the exclusion of other cars.  Such a pattern suggests that the officer's inherent discretion is merely a pretext for true discriminatory intent.  In short, while Grapski may not challenge either of the February 12, 2007 or the August 6, 2007 incidents *individually* under the "class of one" theory,

he may challenge them *collectively* based on their combined tendency to show discriminatory intent.   Grapski does so plead when he alleges: "The Defendants' *campaign* of arrests and harassment intentionally singled out Plaintiff for selective enforcement, inequitable treatment and purposeful discrimination through the unequal . . . administration of the City's ordinances." (emphasis added).  Thus, Grapski's Equal Protection claim must not be dismissed.

**NEGLIGENT TRAINING/SUPERVISION**

Next, the City calls for the dismissal of Counts VII, IX, and XIII, Grapski's state law claims for Negligent Training and Supervision.  It argues that these counts amount to nothing more than Grapski's attempt to hold the City vicariously liable for the allegedly "malicious and bad faith acts of its officers and employees."  Doc. 31.  Florida law holds such liability impermissible.  *See* Fla. Stat. § 768.28(9) ("The state or its subdivisions shall not be liable in tort for the acts or omissions of an officer, employee, or agent committed . . . in bad faith or with malicious purpose.").  In the alternative, it argues that Grapski fails to allege any claim for negligent training that goes beyond a boilerplate recitation of the basic elements of the claim. Doc. 31.  According to the City, such a claim "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).  Finally, the City argues that this Court should not recognize a claim for negligent training and supervision as such functions are entirely subject to governmental discretion and, therefore, immune from liability.  Doc. 31.

Grapski, on the other hand, argues that his claims in Counts VII, IX, and XIII are not based on any theory of vicarious liability.  Rather, these counts allege the City's responsibility "for its own negligence in failing to properly train and supervise its agents, officers and employees."  Doc. 39.  He also argues that these claims are well pleaded as they each allege the

four elements of negligence: duty, breach, causation, and damages. *Id.* Finally, he argues that governmental discretion does not protect a municipality from all claims of negligent training and supervision. *Id.*

Turning first to the City's argument concerning vicarious liability, Florida law does prohibit a plaintiff from bringing an action against a municipality for the malicious or bad faith acts of its officers or employees. *See* Fla. Stat. § 768.28(9). However, Counts VII, IX, and XIII do not seek damages based on vicarious liability. Instead, they demand relief based on theories of negligent training and supervision, pursuant to Fla. Stat. § 768.28(9). Doc. 24 ¶¶ 242-60, 272-90, 324-42. Therefore, dismissal will not turn on whether Grapski has demanded relief based on a prohibited claim of vicarious liability, but rather on whether Grapski has presented a well pleaded claim for negligent training and supervision.

Based on the sufficiency of the facts alleged in these counts, this Court must dismiss Grapski's claims concerning negligent training. However, his claims concerning negligent supervision must not be dismissed. Under *Ashcroft*, a complaint will not satisfy the pleading requirements for the Federal Rules of Civil Procedure "if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Ashcroft*, 129 S. Ct. at 1949 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)). Essentially, a plaintiff's claims must be supported by "sufficient factual material" so as to make the claim "'plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). As to his claims of negligent training, Grapski fails to allege sufficient factual material. Such material would include a specific allegation concerning the City's failure to implement or operate its training programs as they relate to the officers and employees complained of in Counts VII, IX, and XIII. *See Lewis v. City of St. Petersburg*, 260 F.3d 1260, 1266 (11th Cir. 2001). Although Grapski does successfully allege the elements of

negligent training, mere recitation of the elements of a cause of action is not sufficient.  Thus, Grapski's claims of negligent training must be dismissed.

Grapski has, however, alleged facts sufficient to render a claim for negligent supervision plausible.  Under Florida law, "[n]egligent supervision occurs when during the course of employment, the employer becomes aware or should have become aware of problems with an employee that indicated his unfitness, and the employer fails to take further actions such as investigation, discharge, or reassignment."  *Dep't of Envtl. Prot. v. Hardy*, 907 So. 2d 655, 660 (Fla. Dist. Ct. App. 2005) (citing *Garcia v. Duffy*, 492 So. 2d 435, 438-39 (Fla. Dist. Ct. App. 1986)).  In each of his claims, Grapski alleges several facts purporting to show how the City negligently supervised its officers and employees and, thereafter, failed to take further action. *See* Doc. 24 ¶¶ 245-60, 275-290, 327-342.  Therefore, his claims for negligent supervision must not be dismissed.

As to the City's third argument, governmental discretion may serve as a defense to claims of negligent training and supervision.  *See, e.g.*, *Lewis*, 260 F.3d at 1266 (affirming the dismissal of a claim for negligent training because the claim challenged the "reasonableness of basic policy decisions made by the City" and, therefore, violated "the 'discretionary' function exception to the waiver of sovereign immunity").  Since this Court has already dismissed Grapski's claims of negligent training, the Court will focus solely on the legitimacy of claims for negligent supervision.  In general, "[t]he State of Florida has waived sovereign immunity from liability in tort actions under § 768.28 'for any act for which a private person under similar circumstances would be held liable.'" *Dep't Of Envtl. Prot.*, 907 So. 2d at 660 (quoting *Pollock v. Fla. Dep't of Highway Patrol*, 882 So. 2d 928, 932 (Fla. 2004)).  Under this principle, Florida courts have recognized the tort of negligent supervision "in cases involving the state or one of its

agencies as a defendant." *Id.* (citing *Storm v. Town of Ponce Inlet*, 866 So. 2d 713, 717 (Fla. Dist. Ct. App. 2004)).  Based on this recognition, this Court acknowledges the legitimacy of a negligent supervision claim.

Finally, this Court notes that Grapski seems to base his claim for negligent supervision at Count VII on both his arrest on May 1, 2006 and the alleged malicious prosecution which followed.  *See, e.g.*, Doc. 24 ¶¶ 246-47.  As discussed above, any claims arising from the arrest are time barred.  However, any claims arising from the alleged malicious prosecution which followed that arrest are not time barred.  Thus, Grapski's claim for negligent supervision at Count VII may not be based on the May 1, 2006 arrest, but may be based on any events which are not time barred, such as the alleged malicious prosecution which followed.

## DECLARATORY RELIEF & FLORIDA CONSTITUTIONAL CLAIMS

Finally, the City makes two arguments for dismissal which this Court may dispose of quickly.  First, it argues that Count II of Grapski's Amended Complaint must be dismissed for failure to state a claim for declaratory relief.  Doc. 31.  Second, it argues that any claims for damages arising under the Florida Constitution must be dismissed.  *Id.*  Grapski, however, describes these arguments as misdirected, claiming that he seeks neither declaratory relief nor damages based on the Florida Constitution.  Doc. 39.

Upon examining the Amended Complaint, this Court fails to see where Grapski makes *any* claims for declaratory relief or relief based on the Florida Constitution.  In Count II, the only relief sought by Grapski is an award of "damages for the infringement of his First Amendment right to petition the government for redress of grievances, and for injuries to his person." *Id.* ¶ 151(B).  Grapski does allege a claim for declaratory relief in Count II of his Original Complaint. However, the Amended Complaint controls the instant litigation.  This Court declines to

consider arguments in the City's Motion to Dismiss concerning the Original Complaint.  Thus, the City's argument is misdirected and Count II of the Amended Complaint will not be dismissed on these grounds.

Likewise, with regards to claims arising from the Florida Constitution, the City argues that Grapski makes such claims in his Amended Complaint, specifically in paragraphs "68, 112, 114, 112, [and] 218."  Doc. 31.  However, save for paragraph 68, the Amended Complaint seems to make no relevant mention of the Florida Constitution which may reasonably be interpreted as a claim for damages under the Florida Constitution.  Moreover, Grapski himself states that he "makes no attempt to recover damages under the Florida Constitution."  Doc. 39.  The counts in the Amended Complaint are based either on the U.S. Constitution or common law tort claims in Florida.  No claim seems to rely on the Florida Constitution.  At worst, paragraph 68 and its incorporation into other portions of the Amended Complaint may simply be a mistake on Grapski's part.  In short, since Grapski bases none of his claims on the Florida Constitution, the City's argument on this point is misdirected.

**QUALIFIED IMMUNITY**

The Individual Defendants also make an argument for their own dismissal from the case apart from the City.  They argue that the Court must dismiss each claim brought against an individual defendant on the grounds of qualified immunity.  Grapski, on the other hand, argues that qualified immunity should not apply as the allegations against each government actor depict a situation in which the actor violates clearly established statutory or constitutional rights.  For the following reasons, the Court finds that qualified immunity does not apply to this case.

Qualified immunity protects government actors from suit so long as they act within the scope of their discretionary authority.  *Saucier v. Katz*, 533 U.S. 194, 200 (2001).  However, the

doctrine does not apply if the officers' actions violate "'clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  In determining whether the defendants are entitled to qualified immunity, the Court must apply a two part test: (1) whether the plaintiff has alleged facts which "show the officer's conduct violated a constitutional right," and (2) "whether the right was clearly established" at the time of the alleged violation.  *Saucier*, 533 U.S. at 201.  In applying this test, the Court must take the facts "in the light most favorable to the party asserting the injury."  *Id.*

When evaluating the second prong, the unlawfulness of an act or omission must simply be apparent in light of pre-existing law.  *Hope*, 536 U.S. at 739.  As the Eleventh Circuit has stated, whether law is "clearly established" depends on whether the officers had "fair warning" that their conduct was unlawful.  *Vinyard v. Wilson*, 311 F.3d 1340, 1350 (11th Cir. 2002) (citing *Hope*, 536 U.S. 730).  In assessing whether officers had "fair warning," the facts of the instant suit need not be materially similar to any previous case.  *Hope*, 536 U.S. at 739.

Turning now to the facts of the instant case, Grapski makes several allegations against many individual defendants.  Beginning with Defendant Watson, Grapski alleges that Watson was the City Manager for Alachua.  Doc. 24 ¶¶ 44, 48, 63, 99.  As such, in each alleged instance of constitutional, statutory, or state law violation, Grapski alleges that Watson acted within the scope of his discretionary authority.  *Id.*  Normally, the doctrine of qualified immunity protects a government actor in such a scenario.  However, Grapski alleges that with each violation in which Watson played a role, Watson's actions violated clearly established constitutional or statutory rights.

For example, Grapski alleges that Watson elected to press charges against Grapski

despite the "the obvious lack of probable cause to . . . prosecute Grapski for the perfectly legal act of recording the City Manager in the course of his duties and with his consent." *Id. ¶* 48. This implies that Watson lied about the issue of consent. Such an action clearly violates Grapski's constitutional rights. *See Jones v. Cannon*, 174 F.3d 1271, 1285 (11th Cir. 1999) (stating that qualified immunity does not apply to an actor's "allegedly false statements . . . especially [where those statements are] the sole basis asserted for probable cause"); *Herren v. Bowyer*, 850 F.2d 1543, 1547 (11th Cir. 1988) ("The law is 'clearly established' that an arrest without a warrant or probable cause to believe a crime has been committed violates the [F]ourth [A]mendment."). Similarly, Grapski claims that on February 12, 2007, Watson "refused to assist Grapski in obtaining access to public records" at City Hall and subsequently "instructed Chief Jernigan to require Grapski to leave the premises." Doc. 24 ¶¶ 60, 62. Watson ejected Grapski from City Hall "without probable cause and for improper purposes." *Id.* ¶ 65. This ejection clearly violates Grapski's constitutional rights under the Fourth Amendment. *See Herren*, 850 F.2d at 1547. Finally, Grapski alleges that Watson, acting in an official capacity, directed the lobbying of public officials for the prosecution of Grapski where no probable cause existed. Doc. 24 ¶¶ 97, 99. Again, such action violates clearly established constitutional rights. *See Herren*, 850 F.2d at 1547. Thus, as to each claim brought against Watson, qualified immunity does not apply.

Likewise, Grapski claims that Defendant Calderwood served Alachua as its Mayor. With each claim to which Calderwood is a party, Grapski alleges that Calderwood acted within the scope of her discretionary authority. However, such actions violated clearly established constitutional or statutory rights. For example, Grapski alleges that at a City Commission meeting on February 12, 2007, Calderwood, "[w]ithout provocation or probable cause . . .

singled out Grapski and accused him of disrupting the meeting." Doc. 24 ¶ 83.  She then ordered

Police Chief Jernigan to force Grapski to leave the meeting and Jernigan complied.  *Id.* ¶¶ 84-92.

These events happened shortly after Calderwood denied Grapski the right to speak at the

meeting.  *Id.* ¶¶ 73-76.  Again, ordering an arrest where no probable cause exists violates clearly

established constitutional rights under the Fourth Amendment.  Moreover, when hearing the

speech of its citizens at public meetings, public officials clearly may not discriminate between

various speech based on the content of that speech.  *See, e.g.*, *City of Madison, Joint Sch. Dist.*

*No. 8 v. Wis. Emp't Relations Comm'n*, 429 U.S. 167, 176 (1976); *Heffron v. Int'l Soc'y for*

*Krishna Consciousness*, 452 U.S. 640 (1981).  Thus, Calderwood may not shield her actions

under the defense of qualified immunity.

      The same points apply to each of Grapski's claims against the remaining individual

defendants, which include Jernigan, Coerper, and Barcia.  Jernigan violated clearly established

Fourth Amendment rights when he (1) baselessly ejected Grapski from City Hall and issued a

trespass warning, Doc. 24, ¶¶ 62-66, (2) arrested Grapski without probable cause on several

occasions, *Id.* ¶¶ 88-97; 201-213, and (3) used excessive force in the arrest of Grapski, *Id.* ¶¶

201-208, 217.  Similarly, Mayor Coerper violated clearly established First Amendment rights

when he ordered Grapski's removal from a City Commission meeting solely on the basis of the

content of Grapski's speech.  *Id.* ¶¶ 106-110.  Finally, Barcia violated clearly established Fourth

Amendment rights when he allegedly arrested Grapski without probable cause and used

excessive force against Grapski.  *Id.* ¶¶ 201-208, 217.

      In short, qualified immunity does not apply to any of Grapski's allegations against the

Individual Defendants.  Although each is alleged to have acted within the scopes of their

discretionary authorities, they each are also alleged to have violated clearly established

constitutional or statutory rights.  Thus, qualified immunity does not apply.

In conclusion, this Court both affirms in part and denies in part defendants' motions for dismissal of the Amended Complaint.  To continue this action, Grapski must file a second amended complaint so as to clarify the claims he brings against each defendant, dividing into separate counts "each claim founded on a separate transaction or occurrence."  Fed. R. Civ. P. 10(b).  Finally, Grapski's claims against the City for negligent training are dismissed.

Also, the motion to stay discovery (Doc. 75) is denied.  Despite the lack of perfect clarity in the amended complaint, the parties are sufficiently aware of what this case is about to effectively conduct discovery.  Moreover, as noted above, the Court has concluded that the length of the amended complaint (61 pages) is necessitated by the complexity of this case and disagrees with the defendants that the length is due to any lack of conciseness or to shotgun pleading.  Similarly, the defendants should expect that the deposition of witnesses in this case might take longer than in a typical case.  Thus, the parties are commended for agreeing to extend the deposition of the plaintiff for two additional days.  Likewise, the motion at Doc. 98, moving the Court to allow the City to supplement its expert reports after the deadline contained in the Joint Report, is granted.

If fact, the parties should consider if it would benefit the case to agree to a revised discovery schedule and submit it to the Court for approval in a manner similar to the Joint Report under Fed. R. Civ. P. 26.

It is hereby

**ORDERED AND ADJUDGED:**

1.      Motions for Dismissal of the Amended Complaint by defendants City of Alachua and Individual Defendants, Docs. 30, 31, are GRANTED in part and DENIED in part, as set out above.

2.    The plaintiff shall file a second amended complaint by Friday, September 9, 2011, which more clearly articulates the specific conduct and charges applicable to each defendant.

3.    The motion to stay discovery (Doc. 75) is denied.  Despite the lack of perfect clarity in the amended complaint, the parties are sufficiently aware of what this case is about to effectively conduct discovery.

4.    The motion at Doc. 98 is granted.  The City may supplement its expert reports after the deadline contained in the Joint Report.


**DONE AND ORDERED** this _9th_ day of August, 2011


_____*s/Maurice M. Paul*_____

Maurice M. Paul, Senior District Judge